UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JACK BARDALES,                    :
  plaintiff,                      :
                           :
     v.                           :    CASE NO. 3:18-cv-879(AVC)
                           :
MICHELE BIELA, ET AL.             :
  defendants.                     :

**<u>INITIAL REVIEW ORDER</u>**

On May 24, 2018, the plaintiff, Jack Bardales, an inmate
currently confined at MacDougall-Walker Correctional Institution
("MWCI") in Suffield, Connecticut, filed a civil rights
complaint <u>pro</u> <u>se</u> pursuant to 42 U.S.C. §§§ 1983, 1985 and 1986,
against Correctional Managed Health Care ("CMHC") and fifteen
Department of Correction ("DOC")/UConn Medical clinical
officials:  nurses Michelle Biela, C. Chouinard, Heidi Whiteley,
Robert Bonetti, Chris Yarney, Adam Cummings, Carilli and Jane
Doe, nursing supervisor Heidi Greene, doctors J. Wright, Carson
Wright, Omprakash Pillai and Paul Kaloudis, physicians assistant
Kevin McCrystal and medical director John Doe. He is suing
Kaloudis in his individual capacity only and the remaining
defendants in both their individual and official capacities.

Bardales claims that the defendants violated his rights
under the First, Eighth, and Fourteenth Amendments to the United
States Constitution, Article First, § 20 of the Connecticut
Constitution, the Americans with Disabilities Act ("ADA"), the

Rehabilitation Act ("RA"), and the state law tort of intentional infliction of emotional distress.  He seeks declaratory, injunctive, and monetary relief.  On May 31, 2018, Magistrate the court granted his motion to proceed in forma pauperis.  For the following reasons, the complaint is dismissed in part.

## STANDARD

Pursuant to 28 U.S.C. § 1915A, this court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendant fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief.  Bell Atlantic v. Twombly, 550 U.S. 544, 555-56 (2007).  Conclusory allegations are not sufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic, 550 U.S. at 570. Nevertheless, it is well-established that "[p]ro se complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" Sykes v. Bank of Am., 723 F.3d 399, 403 (2d Cir. 2013) (quoting Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006)).

## FACTS

The complaint states the following facts.

Bardales was convicted on December 4, 2013, for non-dependent drug offenses and was sentenced to a twelve-year term of imprisonment.  Sometime in 2009 or 2010, Dr. Zweig, a physician in Bristol, Connecticut, diagnosed him with asymptomatic cholelithiasis, a form of gallstone disease.  Zweig informed Bardales that surgery was not required for his condition but warned that, if he ever experiences severe upper abdominal pain, he should seek immediate emergency medical attention because the episode could result in permanent internal injuries or death.  Medical research shows that painful abdominal symptoms develop in ten to twenty-five percent of patients with Bardales' condition.  They can develop after consumption of large or fatty meals and often include pain, fever, vomiting, chills, and low blood pressure.

Bardales' disease and episodic attacks substantially limited his ability to eat, sleep, and walk.  He suffered many of these attacks from 2014-2016.  His symptoms included severe abdominal pain, low blood pressure, mental anguish, chills, fever, vomiting, nausea, yellowing in the eyes, bloating, weakness, hives on his body and face, dry stool, dark urine, and migraine headaches.

On May 22, 2015, at approximately 8:00 p.m., Bardales requested emergency medical attention from correction officers, who brought him to the medical unit.  At the medical unit, Biela and Chouinard examined Bardales, who was groaning and shaking. Bardales explained to them that he had extreme pain in his upper right abdomen, but Biela only documented that he was experiencing "pain in [his] stomach."  Biela and Chouinard concluded that Bardales was suffering from constipation and gas, administered him Ducolax[1] tablets, and discharged him back to his housing unit.

Bardales alleges that John Doe, the medical director at UConn Health, created and instituted a policy for his employees to minimize or downplay medical diagnoses based on prisoner complaints, particularly from male Hispanic prisoners, in order to avoid further medical expenses.

Later, around 10:25 p.m., while groaning in the fetal position, Bardales again requested emergency medical attention for the same pain.  A correction officer called Biela on Bardales' behalf and then explained to Bardales that Biela had denied medical care for him because she already had treated him earlier in the evening.  Bardales was outraged over the decision

---

[1] Ducolax is an over-the-counter laxative medication for relief from constipation.

and requested that the correction officer call a "Code White."[2]
The officer told Bardales that he had threatened Biela over the
phone that he would call a code white if she refused to respond
to his request for medical evaluation, and afterward, Biela
agreed to see Bardales.

At 11:30 p.m., medical staff transported Bardales to the
medical unit via wheelchair.  There, Bardales explained to Biela
and Chouinard that, back in 2010, Zweig had diagnosed him with
asymptomatic gallstones and warned that he must seek emergency
treatment in the event he suffers from extreme stomach pain.
Bardales also told the nurses that his pain was progressing.
Chouinard documented Bardales' pain level as "10 plus" and wrote
that he was experiencing "stabbing pain in [his] right mid
abdomen area."  Bardales requested a transport to the emergency
room so that a physician could make an objective diagnosis.
Chouinard explained to him that she had explained everything
about his condition and prior diagnosis to her supervisor, J.
Wright, but Wright denied the request for emergency transport.
Chouinard told Bardales that she could not go against the
doctor's orders.  Wright did, however, order that a shot of

---

[2] A "code white" is a signal for a medical emergency which would
trigger an immediate response by all available correction
officers and medical personnel.

Toradol[3] be administered to Bardales to relieve his pain.
Chouinard administered the Toradol and then sent Bardales back
to his housing unit.  Bardales immediately passed out in his
cell from the medication and exhaustion.

Around 4:00 a.m. the next day, Bardales was awakened by the
urgent need for bowel movement.  He stayed awake until 1:30 p.m.
as his pain slowly reduced and passed.  However, he lost his
appetite and went days without eating.  Jon Doe and Greene were
placed on notice of complaints made against J. Wright, Biela,
and Chouinard but failed to take any disciplinary action against
them.

On August 7 and 9, 2015, Bardales suffered gallstone
attacks and submitted requests for "sick call"[4] that were never
answered.  On August 10, around 4:00 p.m., Bardales requested
emergency medical treatment for a severe gallstone attack,
explaining that he was suffering from extreme stomach pain.
Shortly thereafter, however, a correction officer informed
Bardales that Jane Doe had denied him emergency medical
evaluation and instructed him to submit a sick call request,

---

[3] Toradol is an alternative to opioids and acts as an equivalent
to morphine.  Compl. ¶ 56.  Bardales received the maximum dosage
of Toradol for extreme pain.  Id.

[4] "Sick call" is a written inmate request for medical service and
examination.  Compl. ¶ 62.  A completed request is deposited in
the medical box in the inmate's housing unit and are generally
answered by nursing staff.  Id.

even though she knew that such requests could take several days for processing.  Although he submitted a request later that night, Bardales continued to suffer from extreme pain, lack of sleep, and loss of appetite.

On August 16, 2015, Bardales was called to the medical unit for his August 10 sick call request.  There, he explained to Whiteley all of his symptoms, and Whiteley reviewed his medical history.  Whiteley rejected Bardales' theory that he was suffering from problems related to his gallstones and denied his request to see a specialist, stating, "[y]ou're not getting a doctor or nothing, nope!"  She concluded that Bardales was merely suffering from gas and that he did not need any special medical treatment.  Whiteley documented Bardales' pain but minimized the level of pain from which he was suffering and wrote that his appetite was good even though Bardales had had a poor appetite. Whiteley made no further tests or referrals. Bardales continued to suffer from lack of sleep and loss of appetite.  Starting in September, Bardales began purchasing low-fat foods from commissary.

On August 18, Bardales submitted a two-page written sick call request detailing his medical history and requesting evaluation by a specialist.  His request was not answered until December 16, 2016, more than one year later.  Meanwhile, John

Doe and Greene were notified of complaints and grievances made against Whiteley but took no disciplinary action against her.

On February 13, 2016, around 10:30 a.m., Bardales requested emergency medical attention from a correction officer for a gallstone attack.  The correction officer relayed to Bardales that, when she called the medical unit on his behalf, Whiteley said that she knew him and that he "was not [in] an emergency." Whiteley, therefore, refused to respond to Bardales' request. While shaking and groaning on his knees, Bardales insisted that the officer call the medical unit again and threaten to call a code white if they refused evaluation.  The officer agreed and told Whiteley that she would call a code white if medical did not respond.  The officer then told Bardales, "I got Whiteley to receive you, but they won't come get you on nothing; she is brutal! Do you want to try and walk?"  With extreme difficulty, Bardales walked to the medical unit, shaking and groaning along the way.

When he arrived at the medical unit, Whiteley and Bonetti chastised Bardales for seeking emergency treatment.  Whiteley told him, "You are not an emergency, don't ask for that!  You just have gas, I told you."  While shaking and groaning, Bardales insisted that his situation was consistent with gallstone attacks like Zweig had warned, that his pain was unbearable, and that he need a hospital transport.  However,

Whiteley and Bonetti firmly denied the gallstone theory and the
need for hospital treatment and testing.  One of them said,
"That's not happening.  You're not getting none of that!"
Whiteley then weighed Bardales and told him that he had lost a
lot of weight.  Bardales explained that he could not eat or
sleep and had lost 87 pounds since May of 2015.  He said that he
was scared to death over his health issue and the lack of
appropriate response from the medical unit.  Whiteley and
Bonetti administered a "green liquid lactose" solution to
Bardales, charged him $3.00 for the sick call visit per policy,
and sent him back to his housing unit on foot, denying him the
use of a wheelchair.

        Bardales later learned that Bonetti had documented his
complaints as "acute stomach pain" but omitted the location of
his pain, his report about the gallstone diagnosis, his weight
and appetite loss, and his request for a doctor.  Again, John
Doe and Greene did not take any disciplinary action against
Bonetti.

        On March 9, 2016, around 6:40 p.m., Bardales again
requested emergency medical treatment and wheelchair transport
for a severe gallstone attack.  A correction officer called the
medical unit but explained to Bardales that medical staff would
not transport him to the unit.  Thus, Bardales once again walked
to the medical unit, shaking and groaning along the way.  This

time, Yarney agreed that Bardales was suffering from a gallstone attack and contacted Carson Wright, seeking authorization for a hospital transport.  Yarney told Barles that Wright had denied authorization, despite his detailed medical history and current symptoms.  Yarney explained that he did not have the authority to override Wright's decision.  No further observations, tests, or mental health services were ordered.  Per Wright's orders, Yarney administered Bardales Tylenol with codeine for his pain, Cipro to counteract the infection, Tums for indigestion, and liquid Benadryl for the hives that were appearing on his skin. John Doe and Greene permitted these unconstitutional medical responses to occur.

On March 14, 2016, lab results revealed numerous abnormalities consistent with gallstone disease.  John Doe, Carson Wright, and Pillai reviewed these results, but none of them notified Bardales.  Doe and Greene have previously been notified of Pillai's misconduct, which included inappropriate behavior toward nurses, delayed responses to patient care, an arrest for driving under the influence, and repeated omissions from medical reports.

On March 26, 2016, around 11:15 p.m., Bardales requested immediate medical attention for another severe gallstone attack. Again, a correction officer called the medical unit on his behalf.  Id.  He was then transported to the medical unit in a

wheelchair by Cummings and another inmate.  Cummings examined
the plaintiff and his medical history and discovered that he was
suffering from nausea, hives, migraine headaches, and severe
stomach pain.  Bardales also explained that he was severely
stressed out and had substantial weight loss.  Cummings agreed
that his condition was consistent with gallstone disease and
that he needed a hospital transport.

However, he later explained to Bardales that Carson Wright,
the on-call physician, denied authorization for hospital
transport.  Instead, the doctor ordered pain medication,
antibiotics, and overnight observation in the infirmary.
Cummings "intentionally rated his appetitite as fair instead of
poor."  He was later brought into a single cell in the infirmary
where he remained alone.

Approximately forty-five minutes later, Biela and Cummings
noted that Bardales' hives on his face were increasing in size,
that his skin complexion was turning purple, and that he was
shaking, crying and groaning from extreme pain.  Biela said to
Cummings, referring to Bardales, "I remember him.  Come on, he
looks like he's going to die!  I'm calling Dr. Wright myself!"
Thereafter, Biela told Bardales that he had been approved for
hospital transport.

When he arrived at the emergency room at UConn Health
Center, Bardales was handcuffed to the bed while Kaloudis

11

examined him.   Kaloudis almost immediately diagnosed him with "recurrent chollelithiasis with occasional symptoms of choledocolithiasis," a symptomatic gallstone disease, and concluded that he need a surgical cholecystectomy.   A cholecystectomy is a surgical removal of the gallbladder, gallstones, and bile duct stones.   Bardales told Kaloudis that his gallstone attacks began in 2014 and had progressed over time, which caused him extreme pain, rapid weight loss, and loss of sleep.   He also explained that Zweig had warned about seeking emergency treatment in the event of extreme abdominal pain. Kaloudis agreed that Bardales should seek emergency medical treatment when the attacks occur but disagreed that his condition warranted immediate surgery.   Kaloudis explained that surgery referrals for inmates need to be approved by the Utilization Review Committed ("URC"), which could take several months.   Non-hispanic inmates, however, are admitted and referred for surgery within two to three days and undergo surgery soon thereafter.   Kaloudis had the authority to order surgery for Bardales and schedule it within two or three days, but he declined to order such services.   He instructed Bardales to stay away from fatty foods, which may contribute to his gallstone attacks, and then sent him back to MWCI.

When Bardales arrived back at MWCI, Pillai ordered prescriptions, a low-fat diet, and lab work-ups consistent with

Kaloudis' recommendations.  He explained to Bardales that "[t]he pain meds will help [him] sleep and the antibiotics [were] in case [his] gallstones caused internal infections."  Bardales received the low-fat diet until May 13, 2016, after which he was forced to purchase such foods through commissary.  Pillai also agreed that immediate surgery was not necessary and instructed Bardales to request emergency medical attention in the event of another gallstone attack while he waited URC approval for surgery.  Pillai did not, however, submit a URC request for surgery until July 21, 2016, nearly four months after Bardales visited the emergency room.

On April 21, 2016, around 8:15 a.m., Bardales requested emergency medical attention for another gallstone attack.  He was transported via wheelchair to the medical unit.  There, McCrystal and Carilli examined Bardales and determined that Bardales was suffering from the usual symptoms and also had a low blood pressure.  McCrystal documented Bardales' pain level as a "7-8," even though Bardales described it as a "10." Bardales explained his entire medical history with McCrystal and Carilli and pleaded that they send him to UConn Health Center. However, McCrystal dismissed his complaints and said, "[y]ou're

not going to the hospital, and you're getting T-3s[5] for the pain.  If it doesn't work, you're just going to have to deal with it.  I'm sending you to the infirmary for observation, it will pass."  Another nurse asked if McCrystal could at least rush his surgery request, but McCrystal ignored her.  He then ordered Carilli to administer T-3s, an injection of Phenergan for nausea, and place him in the infirmary for observation.

Later that afternoon, Bardales told Carilli that the T-3s had done nothing to relieve his pain.  Carilli responded, "[s]orry, McCrystal won't give you anything else, and I can't give you anything else for the pain.  It will pass.  Try to eat."  Shortly thereafter, McCrystal and Carilli learned that Bardales' pain had subsided and discharged him back to his housing unit.  Both of them had previously received complaints and grievances regarding their conduct, but John Doe and Greene failed to take any disciplinary action against them.

On May 8, 2016, around 3:00 p.m., Bardales pressed the medical emergency intercom in his cell and reported to correction staff that he was experiencing another severe gallstone attack.  Fifteen minutes later, a correction officer arrived at his cell and observed him groaning near the toilet

---

[5] Although it is not clear from the complaint, upon information and belief, "T-3s" refer to Tylenol with Codeine #3, which is administered for pain relief.

and shaking with hives.  The officer called the medical unit and explained the situation to Bonetti, but Bonetti indicated that "he was too busy" and declined to help.

At 3:45 p.m, Bardales' condition worsened.  The same correction officer shined a flashlight on his face and said, "You're getting worse!  You have a lot more hives now.  I'm calling back, this is crazy!"  He then told Bardales that he had spoken with Bonetti, who refused to acknowledge the emergency and provide any assistance.  Bardales then asked the officer to call a code white.  Angry with Bonetti's responses, the officer called for all available medical personnel to assist Bardales. A short time later, Bonetti and another correction officer responded to Bardales' cell.  When he arrived at the cell, Bonetti shouted at Bardales in front of other inmates, "What's wrong with you man?!"  Bardales explained that he was experiencing a severe gallstone attack, that his hives were getting worse, that he was awaiting approval for surgery, and that Kaloudis at UConn Health Center had instructed him to seek immediate medical attention in the event of a gallstone attack. Bonetti replied, "Oh, I know exactly who you are and what you're here for.  Trust me, there will be no pain meds and no doctor. I don't need to look at your file or call a doctor.  You don't dictate to me what I need to do.  You're standing, able to talk, breathing, and not lying on the floor unconscious or bleeding to

death!  This is not an emergency or code-worthy.  The prison is not going to stop just for you!"  Bardales said to Bonetti, "Just because my criminal record is for drugs doesn't mean I am a pain med abuser.  I'm not and never was.  I was convicted as a non-dependent, which can be verified, and I have a serious medical condition, gallstone disease.  Why are you mistreating me?  Please bring me to medical."  Bonetti refused a transport to the medical unit, insisting that there was no emergency, and said, "There's nothing wrong with you and no pain!  Oh, I'm done with this guy!"  He then stormed out of the housing unit.

After Bonetti left, Bardales sat down on the stairs in his housing unit, shaking and crying.  The correction officer who had called Bonetti approached Bardales and said, "I'm sorry man, Bonetti is known as a fucking asshole.  No one likes him."  He also explained that Bonetti was the subject of numerous complaints and grievances, one of which was for verbally abusing a female nurse.

Later, around 5:00 p.m., another correction officer wrote Bardales a pass to go to the medical unit.  He explained to Bardales that he had convinced medical to evaluate him but that he would have to walk there himself.  When he arrived, he was evaluated by Yarney, who reviewed his entire medical history. Meanwhile, Bonetti wrote false notes in Bardales' medical file, including that his pain level was "0" when, in fact, it was

"10."  Yarney confirmed that his medical file was accurate.
Bardales then requested a hospital transport, but Yarney refused
and sent him back to his housing unit.

On May 16, 2016, Bardales wrote a complaint to nursing
supervisor Greene about Yarney's and Bonetti's responses to his
medical requests.  He followed up with a medical grievance on
June 7, 2016.  Neither the complaint nor the grievance were
answered.

On May 18, 2016, Bardales told Pillai all about Yarney's
and Bonetti's conduct.  Pillai told Bardales, "Demand them to
send you out to the ER hospital, they need to send you out when
you have [an] attack!"  He then re-ordered a low-fat diet for
Bardales, but Bardales never received the appropriate food
items, which forced him to purchase them through commissary.

On September 12, 2016, around 1:00 p.m., Bardales
experienced another severe gallstone attack and repeatedly
forced himself to vomit to relieve his pain.  He submitted a
written request for mental health treatment because of all the
emotional distress, anguish, and humiliation he had endured
regarding his condition and the responses from medical
personnel.  After another attack on September 26, he again
forced himself to vomit until the pain and other symptoms
subsided.

On October 28, Bardales underwent his laparoscopic cholecystectomy at UConn Health Center.  Weeks later, he filed a grievance against medical staff at MWCI for all their misconduct and failure to respond to his written complaints.

On December 16, Greene called Bardales and interviewed him regarding his grievance.  Bardales explained his entire medical history and interactions with the medical personnel.  He also requested reimbursement for all the sick call visit charges and low-fat food purchases.  Greene told him:

> I'm so sorry you were mistreated and had to go through all that.  I apologize for not answering your previous requests and grievance.  [W]e'll address it all now here, together.  You should have been treated with a proper standard of care for your medical condition.  Even as an inmate, you those rights, to be treated just like a patient in the world.  I'll have all of your improperly charged sick call fees be returned to you, I will run everything by HSA Lightner to get approved . . . and I will follow up with all the staff, I will review camera footage too . . . we just can't refund [the] money you spent on your low-fat diet. . . I'm glad you finally got your surgery, are you ok[ay] now?

Id. at ¶ 257.  Bardales said that he was fine and was satisfied with Greene's response.  Greene then documented his grievance as "upheld."

After waiting over a year, Bardales received his complete medical record.  Therein, he noticed remarks from Dr. Giles, the attending physician during his surgery, which were "[t]hickened gallbladder, multiple stones, thickened cystic duct, rounded edges of liver, lobe hypertrophy (inflamed liver)."  Giles

18

ordered a follow-up bioposy of his liver and gallbladder.  His
report also recommended further work-ups for abnormalities
discovered in Bardales' liver.  Pillai later ordered lab work-
ups consistent with Giles' orders but did not review the results
with Bardales and repeatedly postponed follow-up appointments.

## DISCUSSION

Bardales claims that Biela, Chouinard, J. Wright, C.
Wright, Whiteley, Cummings, Pillai, McCrystal, Carilli, nurse
Doe, Dr. Doe, and Kaloudis violated his rights under the Eighth
and Fourteenth Amendments to the United States Constitution,
Article First, § 20 of the Connecticut Constitution, the ADA,
and the RA by acting with deliberate indifference to his serious
medical needs and discriminating against him on the bases of his
race and disability.  He claims that Whiteley, Bonetti,
Cummings, Yarney, C. Wright, Pillai, and McCrystal retaliated
against him for exercising his right to free speech under the
First Amendment to the United States Constitution.  Bardales
also raises supervisory liability claims for violations of the
First, Eighth, and Fourteenth Amendments against J. Wright, C.
Wright, Pillai, McCrystal, Greene, and Dr. Doe and multiple
claims against the Correctional Managed Health Care ("CMHC").
As remedies, he seek declaratory, injunctive, and monetary
relief.

## I. Claims Against CMHC

The CMHC is not a "person" subject to suit under 42 U.S.C. § 1983 because it is a division of a state agency.  Figueroa v. Correctional Managed Health Care, No. 3:16-cv-120 (VAB), 2016 WL 7428191, *3 (D. Conn. Dec. 23, 2016).  A state agency is not a "person" within the meaning of § 1983.  See Will v. Michigan Dep't of State Police, 491 U.S. 58, (1989).  Therefore, Bardales' claim against the CMHC is dismissed because it lacks an arguable legal basis.  See 28 U.S.C. § 1915A(b)(1).

## II. First Amendment Retaliation

"Prison officials may not retaliate against inmates for exercising their constitutional rights."  Riddick v. Arnone, No. 3:11-cv-631 (SRU), 2012 WL 2716355, *6 (D. Conn. Jul. 9, 2012).  "To prevail on a First Amendment retaliation claim, [a prisoner] must establish (1) that the speech or conduct at issue was protected, (2) that the [official] took adverse action against the [prisoner], and (3) that there was a causal connection between the protected [conduct] and the adverse action."  Holland v. Goord, 758 F.3d 215, 225 (2d Cir. 2014) (internal quotation marks omitted); Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009).  "In the prison context, 'adverse action' is objectively defined as conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'"  O'Diah v. Cully, No. 3:08-cv-941, 2013

WL 1914434, *9 (N.D.N.Y. May 8, 2013) (quoting <u>Davis v. Goord</u>, 320 F.3d 346, 353 (2d Cir. 2003)); <u>see also</u> <u>Ramsey v. Goord</u>, 661 F. Supp. 2d 370, 399 (W.D.N.Y. 2009) (recognizing that prisoners may be required to tolerate more than average citizens before alleged retaliatory action against them is considered adverse).

In order to allege causation, the prisoner must state facts "suggesting that the protected conduct was a substantial or motivating factor in the prison official's decision to take action against [him]." <u>Moore v. Peters</u>, 92 F. Supp. 3d 109, 121 (W.D.N.Y. 2015) (quoting <u>Burton v. Lynch</u>, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)). Some of the facts often used to determine retaliatory motive include (1) temporal proximity between the protected conduct and the alleged retaliatory act, (2) the prisoner's good disciplinary record, (3) a finding of not guilty at the disciplinary hearing, and (4) statements by the official showing motivation. <u>Id.</u>; <u>O'Diah</u>, 2013 WL 1914434, *10.

"Because claims of retaliation are easily fabricated, the courts consider such claims with skepticism and require that they be supported by specific facts; conclusory statements are not sufficient." <u>Riddick</u>, 2012 WL 2716355, *6; <u>see also</u> <u>Dawes v. Walker</u>, 239 F.3d 489, 491 (2d Cir. 2001) ("virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally

proscribed retaliatory act"). "Accordingly, plaintiffs in retaliatory motive cases must plead 'specific and detailed factual allegations which amount to a persuasive case' or 'facts giving rise to a colorable suspicion of retaliation.'" Moore, 92 F. Supp.3d at 120 (quoting Johnson v. Eggersdorf, 8 F. App'x 140, 144 (2d Cir. 2001)).

Although Bardales alleges that he filed a number of written complaints and grievances and that several of the defendants took adverse action against him, particularly in response to requests for medical treatment, he has not alleged sufficient facts showing a causal connection between his grievances and the defendants' action. While the allegations may show deliberate indifference on the part of several defendants, the court does not agree that Bardales has sufficiently alleged facts showing a retaliatory motive. Therefore, the First Amendment retaliation claim is dismissed.

## III. **Eighth Amendment Deliberate Indifference to Medical Needs**

Deliberate indifference to a serious medical need occurs when an official knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. Harrison v. Barkley, 219 F.3d 132, 137-38 (2d Cir. 1998) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)). In order to prevail on his deliberate indifference claim, the plaintiff must show both that his

medical need was serious and that the defendants acted with a
sufficiently culpable state of mind.  See Smith v. Carpenter,
316 F.3d 178, 184 (2d Cir. 2003) (citing Estelle v. Gamble, 429
U.S. 97, 105 (1976)).  There are both objective and subjective
components to this standard.  See Hathaway v. Coughlin, 37 F.3d
63, 66 (2d Cir. 1994).  Objectively, the alleged deprivation
must be "sufficiently serious."  Wilson v. Seiter, 501 U.S. 294,
298 (1991).  Subjectively, the defendants must have been
actually aware of a substantial risk that the plaintiff would
suffer serious harm as a result of their acts.  See Salahuddin
v. Goord, 467 F.3d 263, 280–81 (2d Cir. 2006).

After careful review of the complaint, the court will
permit Bardales' Eighth Amendment claim to proceed against
Biela, Chouinard, Whiteley, Cummings, McCrystal, and Jane Doe
based on allegations that they downplayed the pain and suffering
he was experiencing and/or failed to provide him with immediate
assistance following his requests for emergency medical
attention.  The court will also permit the claim to proceed
against Pillai and Kaloudis based on their failure to procure
immediate surgery and post-operative treatment for Bardales,
following his hospitalization and the discovery of his gallstone
disease.

The court does not, however, find sufficient facts to
permit Bardales' Eighth Amendment claim to proceed against

Carilli in his individual capacity.  There are no facts showing
that Carilli personally acted with deliberate indifference to
Bardales' condition.  Moreover, Bardales has not stated a
plausible Eighth Amendment claim against J. Wright or C. Wright,
both of whom prescribed treatment in response to Bardales'
complaints and visits to the medical unit.  Although Bardales
may contend that their treatment was not sufficiently adequate,
disagreements over proper medical responses do not constitute
grounds for relief under the Eighth Amendment.  Chance v.
Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).  Thus, the Eighth
Amendment claim may proceed against Biela, Chouinard, Whiteley,
Cummings, Pillai, McCrystal, Jane Doe, and Kaloudis in their
individual capacities for damages and in their official
capacities for injunctive relief.  The claims against Carilli,
J. Wright, and C. Wright, however, are dismissed.

## IV. <u>Supervisory Liability Claims</u>

Bardales is raising supervisory liability claims against J.
Wright, C. Wright, Pillai, McCrystal, Greene, and John Doe for
their failure to supervise their subordinate medical employees,
who acted with deliberate indifference to his medical needs.

"It is well settled . . . that personal involvement of
defendants in alleged constitutional deprivations is a
prerequisite to an award of damages under § 1983." Wright v.
Smith, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks

omitted); see also Johnson v. Glick, 481 F.2d 1028, 1034 (2d
Cir. 1973) (holding that doctrine of respondeat superior does
not suffice for claim of monetary damages under § 1983).  A
plaintiff who sues a supervisory official for monetary damages
must allege facts showing that the official was "personally
involved" in the constitutional deprivation in one of five ways:
(1) the official directly participated in the deprivation; (2)
the official learned about the deprivation through a report or
appeal and failed to remedy the wrong; (3) the official created
or perpetuated a policy under which unconstitutional practices
occurred; (4) the official was grossly negligent in managing
subordinates who caused the unlawful condition or event; or (5)
the official failed to take action in response to information
regarding the unconstitutional conduct.  Wright, 21 F.3d at 501;
Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003).

The court has already permitted Bardales' Eighth Amendment
claim to proceed against Pillai and McCrystal, in their
individual capacities, based on allegations that they personally
acted with deliberate indifference to his medical needs.  The
court concludes that Bardales has sufficiently alleged
supervisory liability against Greene and John Doe based on
Greene's admissions during the December 2016 interview that many
of her staff members subjected him to an improper standard of
care.  However, as previously stated, Bardales has not shown

deliberate indifference on the part of J. Wright, or C. Wright, both of whom prescribed medication in response to his complaints.  Therefore, the court will permit the Eighth Amendment claim to proceed against Greene and John Doe in their individual capacities for damages and in their official capacities for injunctive relief, but the claims against Carilli, J. Wright, and C. Wright remain dismissed.

## V. Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  The clause "protects prisoners from invidious discrimination." Riddick v. Arnone, No. 3:11-cv-631 (SRU), 2012 WL 2716355, *3 (D. Conn. Jul. 9, 2012).  It does not require identical treatment for each individual; rather, it requires that a similarly situated person be treated the same. City of Cleburne, Tex., 473 U.S. at 439-40.  "To state a claim for an equal protection violation, a plaintiff must plausibly allege that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." Rossi v. Fischer, No. 13-cv-3167 (PKC/DF), 2015 WL 769551, *13 (S.D.N.Y. Feb. 24, 2015) (quoting Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005)).

A prisoner may also state an Equal Protection claim under the "class of one theory."  To state such a claim, he must allege that (1) he has been intentionally treated differently than other similarly situated inmates; and (2) there is no rational basis for the disparity in treatment.  Holmes v. Haugen, 356 F. App'x 507, 509 (2d Cir. 2009); Green v. Martin, 224 F. Supp. 3d 154, 171 (D. Conn. Dec. 14, 2016).  The prisoner must allege an "extremely high" level of similarity with the person to whom he is comparing himself.  Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005).  His circumstances and the other person's must be "prima facie identical."  Id. at 105.

At various times during his complaint, Bardales alleges that the defendants "documented" him as a Hispanic male in his medical file, and Bardales identifies each defendant by their race and gender.  The disparity in race between Bardales and the defendants, alone, does not sufficiently show an equal protection violation.  There are no facts suggesting that the adverse or inadequate actions taken by the defendants in response to Bardales' medical complaints were the result of a discriminatory animus because of his race, convictions, or any other identifying factor, nor are there sufficient facts showing that Bardales was treated differently than other similarly situated inmates.  Thus, his equal protection claim is entirely conclusory and is hereby dismissed.

## VI. <u>State Constitutional Claim</u>

Bardales also claims that the defendants violated his
rights under Article First, § 20 of the Connecticut
Constitution.  Article First, § 20 of the Connecticut
Constitution provides that "[n]o person shall be denied equal
protection of the law nor be subjected to segregation or
discrimination in the exercise or enjoyment of his or her civil
or political rights because of religion, race, color, ancestry,
national origin, sex or physical or mental disability."  Like
his Fourteenth Amendment claim, Bardales' claim under this
constitutional provision is factually unsupported.  He has not
shown that the defendants' actions were based on a
discriminatory motive because of his race, convictions, or
disability.  Therefore, the state constitutional claim is
dismissed.

## VII. <u>Claims under the ADA and RA</u>

To state a claim under the ADA or RA, a prisoner must
allege:  (1) that he is a "qualified individual" with a
disability; (2) that he was excluded from participation in a
public entity's services, programs or activities or was
otherwise discriminated against by a public entity; and (3) that
such exclusion or discrimination was due to his disability.
<u>Fulton v. Goord</u>, 591 F.3d 37, 43 (2d Cir. 2009) (quoting
<u>Hargrave v. Vermont</u>, 340 F.3d 27, 34-35 (2d Cir. 2003)); <u>see</u>

28

also <u>Clarkson v. Coughlin</u>, 145 F.R.D. 339, 348 (S.D.N.Y. 1993)

(proof required under ADA is substantially identical to claim

under § 504 of RA).  A "qualified individual" is:

> an individual with a disability who, with or without
> reasonable modifications to rules, policies, or
> practices, the removal of architectural, communication,
> or transportation barriers, or the provision of
> auxiliary aids and services, meets the essential
> eligibility requirements for the receipt of services or
> the participation in programs or activities provided by
> a public entity.

<u>Fulton</u>, 591 F.3d at 432 (quoting 42 U.S.C. § 12131(2)).  "A

qualified individual can base a discrimination claim on any of

three available theories:  (1) intentional discrimination

(disparate treatment); (2) disparate impact; and (3) failure to

make a reasonable accommodation."  <u>Id.</u> (quoting <u>Tsombanidis v.</u>

<u>West Haven Fire Dep't</u>, 352 F.3d 565, 573 (2d Cir. 2003)).

Intentional discrimination may be inferred when the official

acted with "deliberate indifference to the strong likelihood

that a violation of federally protected rights will result from

the implementation of the challenged policy . . . or custom."

<u>Bartlett v. New York State Bd. Of Law Examiners</u>, 156 F.3d 321,

331 (2d Cir. 1998) (internal quotations omitted), <u>overruled</u> <u>on</u>

<u>other</u> <u>grounds</u>, <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471

(1999).

The ADA requires that Bardales demonstrate a physical or

mental impairment to be deemed to have a "disability."  <u>Smith v.</u>

Masterson, 353 F. App'x 505, 507 (2d Cir. 2009).  The ADA

defines "disability" as "a physical or mental impairment that

substantially limits one or more major life activities of such

individual."  42 U.S.C. § 12102(1)(A).  "[A] 'major life

activit[y]' is one that is 'of central importance to daily

life,' such as 'walking, seeing, and hearing.'"  Troeger v.

Elleville Cent. School Dist., 523 F. App'x 848, 852 (2d Cir.

2013) (quoting Toyota Motor Mfg., Ky., Inc. v. Williams, 534

U.S. 184, 197 (2002).  "[I]n assessing whether a plaintiff has

a disability, courts have been careful to distinguish

impairments which merely affect major life activities from those

that substantially limit those activities."  Id. (quoting Ryan

v. Grae & Rybicki, P.C., 135 F.3d 867, 870 (2d Cir. 1998)).

     Even assuming Bardales' medical condition qualifies as a

disability under the ADA, he has not alleged facts showing that

the defendants intentionally discriminated against him through

policy or custom, took action that created a disparate impact,

or failed to reasonably accommodate him for his disability.

Although he has sufficiently alleged that several of the

defendants acted with deliberate indifference to his medical

needs, the complaint is devoid of facts showing that the

defendants' actions were discriminatory in nature.  Moreover,

Bardales' claims that their actions were taken in accordance

with unlawful policies or customs enacted by high ranking DOC

medical personnel are conclusory and factually unsupported.

Thus, the ADA and RA claims are dismissed.

**VIII. <u>Claims Under §§ 1985 and 1986</u>**

Bardales also raises claims under §§ 1985 and 1986, but those claims also cannot proceed because he has failed to allege sufficient facts showing racial discrimination.  Section 1985 is divided into three subsections, each with its own prohibition. Subsection (1) prohibits conspiracies to prevent federal officials from performing their duties.  <u>Harnage v. Dzurenda</u>, No. 3:14-cv-885 (SRU), 2014 WL 3360342, *2 (D. Conn. Jul. 9, 2014).  Subsection (2) prohibits conspiracies to deter witnesses from participating in state or federal judicial proceedings. <u>Id.</u>  Finally, subsection (3) prohibits conspiracies to deprive persons of equal protection of the laws.  <u>Id.</u>  In order to state a claim under section 1985, Bardales must allege:

> (1) the defendants were part of a conspiracy; (2) the purpose of the conspiracy was to deprive a person or class of persons of the equal protection of the laws; (3) an overt act taken in furtherance of the conspiracy; and (4) an injury to his person or property, or a deprivation of a right or privilege.  <u>Importantly, [the plaintiff] must show that the conspiracy was motivated by a racial or otherwise class-based invidious discriminatory animus.</u>

<u>Id.</u> (emphasis added); <u>see</u> <u>also</u> <u>Dolan v. Connolly</u>, 794 F.3d 290, 296 (2d Cir. 2015).  "Section 1986 provides no substantive rights; it provides a remedy for the violation of section 1985. . . Thus, a prerequisite for an actionable claim under section 1986, is a

31

viable claim under section 1985." <u>Harnage</u>, 2014 WL 3360342, *2.
Because Bardales has not shown that any of the defendants acted
from a discriminatory motive, his §§ 1985 and 1986 claims are
dismissed.

**IX.** <u>State Law Tort Claim</u>

Bardales also alleges a state law claim of intentional
infliction of emotional distress against Biela, Chouinard, J.
Wright, C. Wright, Whiteley, Cummings, Pillai, McCrystal,
Carilli, Jane Doe, John Doe, and Kaloudis, the same defendants
against whom his Eighth Amendment claim is directed.  The court
may exercise supplemental jurisdiction over the state law claim
because it derives from the same operative facts as the Eighth
Amendment claim.  See <u>Valencia ex rel. Franco v. Lee</u>, 316 F.3d
299, 305 (2d Cir. 2003).

In order to assert a claim for intentional infliction of
emotional distress, a plaintiff must establish four elements:
"(1) that the actor intended to inflict emotional distress; or
that he knew or should have known that the emotional distress
was a likely result of his conduct; (2) that the conduct was
extreme and outrageous; (3) that the defendant's conduct was the
cause of the plaintiff's distress; and (4) that the distress
suffered by the plaintiff was severe." <u>Miner v. Town of
Cheshire</u>, 126 F. Supp. 2d 184, 194 (D. Conn. 2000) (quoting
<u>Petyan v. Ellis</u>, 200 Conn. 243, 253 (1986); <u>see also Cavuoto v.</u>

<u>Oxford Health Plans, Inc.</u>, No. 3:99-cv-00446 (EBB), 2000 WL 888263 at *8 (D. Conn. June 22, 2000); <u>DeLaurentis v. New Haven</u>, 220 Conn. 225, 266-67 (1991).  To be held liable for intentional infliction of emotional distress, the conduct at issue must be "so extreme and outrageous that it goes beyond all possible bounds of decency, is regarded as atrocious, is utterly intolerable in a civilized society, and is of a nature that is especially calculated to cause, and does cause, mental distress of a very serious kind."  <u>Miner</u>, 126 F. Supp.2d at 194.

Although the court has the power to exercise supplemental jurisdiction over this claim, Bardales has not stated a plausible claim of intentional infliction of emotional distress against any of the defendants.  Their conduct, while perhaps deliberately indifferent, was not extreme and outrageous that was "especially calculated to cause" Bardales mental distress.  Thus, the state law claim is dismissed.

## X. **Claims for Relief**

In addition to damages and injunctive relief, Bardales seeks declaratory judgments against the defendants.  Declaratory relief serves to "settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of that right or a disturbance of the relationship." <u>Colabella v. American Inst. Of Certified Pub. Accountants</u>, No. 10-cv-2291 (KAM) (ALC), 2011 4532132, *22 (E.D.N.Y. Sep. 28, 2011)

(citations omitted).  Declaratory relief operates prospectively to enable parties to adjudicate claims before either side suffers great damages.  See In re Combustion Equip. Assoc., Inc., 838 F.3d 35, 37 (2d Cir. 1998).  Bardales' request for declaratory relief in this case only concerns past actions by the defendants in response to his medical issues.  He has not identified any legal relationships or issues that require resolution by declaratory relief.  See Ward v. Thomas, 207 F.3d 114, 119-20 (2d Cir. 2000) (recognizing that the Eleventh Amendment bars declaration that state violated federal law in the past). Therefore, his claim for declaratory relief against the defendants is unwarranted and is hereby dismissed.

To the extent Bardales seeks damages against the defendants in their official capacities, such claims are barred by the Eleventh Amendment.  See Kentucky v. Graham, 473 U.S. 159 (1985); Quern v. Jordan, 440 U.S. 332, 342 (1979).  Thus, the case may proceed on the Eighth Amendment claim against Biela, Chouinard, Whiteley, Greene, Cummings, Pillai, McCrystal, Jane Doe, John Doe, and Kaloudis in their individual capacities for damages and in their official capacities for injunctive relief. All other claims are dismissed.

### ORDERS

(1)  All claims against CMHC, J. Wright, C. Wright, Bonetti,

Yarney, and Carilli are dismissed.  The case may proceed only on the Eighth Amendment claim for deliberate indifference to serious medical needs against Biela, Chouinard, Whiteley, Greene, Cummings, Pillai, McCrystal, Jane Doe, John Doe, and Kaloudis in their individual capacities for damages and in their official capacities for injunctive relief.  All other claims are dismissed.

(2)  The clerk shall prepare a summons form and send an official capacity service packet to the U.S. Marshal Service. The U.S. Marshal is directed to effect service of the complaint on Biela, Chouinard, Whiteley, Greene, Cummings, Pillai, McCrystal, Jane Doe, John Doe, and Kaloudis in their official capacities at the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141, within twenty-one (21) days from the date of this order and to file a return of service within thirty (30) days from the date of this order.

(3)  The clerk shall verify the current work addresses for Biela, Chouinard, Whiteley, Greene, Cummings, Pillai, McCrystal, and Kaloudis with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to each defendant at the confirmed address within **twenty-one (21) days of this order**, and report to the court on the status of the waiver request on the **thirty-fifth (35) day after mailing**.  If any defendant fails to return the waiver request, the clerk

35

shall make arrangements for in-person service by the U.S.
Marshal Service on him/her, and he/she shall be required to pay
the costs of such service in accordance with Rule 4(d) of the
Federal Rules of Civil Procedure.

(4)   Because Bardales has not identified nurse Jane Doe or
director John Doe by name, the clerk is not able to serve a copy
of the complaint on them in their individual capacities.  Within
**ninety (90) days of the date of this order**, Bardales shall
conduct discovery and file a notice indicating the first and
last names of Nurse Jane Doe and Director John Doe.  If Bardales
files the notice, the court will direct the clerk to effect
service of the complaint on those defendants in their individual
capacities.  If Bardales fails to identify those defendants
within the time specified, the claims against them may be
dismissed.

(5)   Biela, Chouinard, Whiteley, Greene, Cummings, Pillai,
McCrystal, Jane Doe, John Doe, and Kaloudis shall file their
response to the complaint, either an answer or motion to
dismiss, within **sixty (60) days from the date the notice of
lawsuit and waiver of service of summons forms are mailed to
them**.  If the defendants choose to file an answer, they shall
admit or deny the allegations and respond to the cognizable
claims recited above.  They may also include any and all

additional defenses permitted by the Federal Rules of Civil Procedure.

(6)  Discovery, pursuant to Fed. R. Civ. P. 26-37, shall be completed within **six months (180 days) from the date of this order**.  Discovery requests need not be filed with the court.

(7)  Any motions for summary judgment shall be filed within **seven months (210 days) from the date of this order**.

It is so ordered this 7th day of June, 2018, at Hartford, Connecticut.

_____/s/_____
Alfred V. Covello
United States District Judge
